**HARRAH'S ENTERTAINMENT, INC., et al., Plaintiffs,**

v.

**STATION CASINOS, INC., et al., Defendants.**

**No. CV–S–01–0825DAERJJ.**

United States District Court, D. Nevada.

May 19, 2004.

J. Ebert, J. William Ebert, Ltd., Las Vegas, NV, Kevin Johnson, Fish & Neave, Mark Rowland, Fish & Neave, Norman Beamer, Fish & Neave, Patricia Campbell, Fish & Neave, Ray Zado, Fish & Neave, Renee Stasio, Fish & Neave, Palo Alto, CA, for Harrah's Operating Company, Inc., Harrah's Entertainment, Inc., Plaintiffs.

Ike Epstein, Beckley Singleton, Chtd., Michael Feder, Beckley Singleton, Chtd., Las Vegas, NV, Christopher Chalsen, Milbank, Tweed, Hadley & McCloy, Christopher Gaspar, Milbank, Tweed, Hadley & McCloy, Lawrence Kass, Milbank, Tweed, Hadley & McCloy, New York City, for Boulder Station, Inc., Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF PATENT UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT

EZRA, Chief Judge.

The court heard Defendants' Motion on March 23, 2004. Mark D. Rowland, Esq., appeared at the hearing on behalf of Plaintiffs; Ike Lawrence Epstein, Esq., Lawrence Kass, Esq., Christopher Chalsen, Esq., Michael Feder, Esq., Christopher Gaspar, Esq., and Rich Haskins, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motion and the supporting and opposing memoranda, the court DENIES Defendants' Motion for Summary Judgment of Patent Unenforceability Due to Inequitable Conduct.

## BACKGROUND

Plaintiffs Harrah's Entertainment, Inc., and Harrah's Operating Company, Inc., ("Plaintiffs") obtained three patents relating to a system for coordinating the monitoring and accessing of information relating to customer gaming and non-gaming activity across multiple casino locations. More specifically, the patents, termed the National Player Recognition patents, including U.S. Patents Nos. 5,761,647 ("the '647 patent"), 6,003,013 ("the '013 patent"), and 6,183,362 ("the '362 patent"), describe and claim methods and systems for rewarding customer patronage, tracking customers, and making customer data available to affiliated casino properties. Plaintiffs sued Defendants Station Casinos, Inc., Boulder Station, Inc., Palace Station Hotel & Casino, Inc., Santa Fe Station Inc., Sunset Station, Inc., Texas Station, LLC, Green Valley Ranch Gaming, LLC, and Does 1–20 ("Defendants") for patent infringement.

In the instant motion, Defendants allege that all three of the patents-in-suit should be invalidated on the grounds of inequitable conduct by Plaintiffs and Mr. John Boushy ("Mr. Boushy"), Plaintiffs' primary inventor of the National Player Recognition Patents. Mr. Boushy was hired in 1979 by Plaintiffs' Atlantic City location as manager of data processing. In 1989, Mr. Boushy became Vice President ("VP") of Strategic Marketing for Plaintiffs. According to Plaintiffs, he was charged with identifying opportunities to turn Harrah's Casinos into a brand. Plaintiffs state that when Mr. Boushy started his term as VP, Plaintiffs' casino properties each had local casino management systems and distinct policies for rewarding frequent customers. Plaintiffs' Opposition at 1. In 1992, Mr. Boushy became VP of Marketing and Corporate Marketing Services. Under Mr. Boushy's direction, Plaintiffs implemented

the Gold Card program which allowed customers to be recognized at any of Plaintiffs' casino properties. According to Plaintiffs, however, the local casino management systems for each of the casinos continued to maintain information generated from customers frequenting only one casino property.

Starting in mid–1992, Plaintiffs state that Mr. Boushy conceived of several novel ideas, for which he sought patent protection, for local casino management systems that could share customer gaming data with one another through a central customer database to provide information that could better track customers over Plaintiffs' various casino properties. Plaintiffs' Opposition at 2. Over the next five years, during which time Mr. Boushy became VP of Information Technology, he presented patent applications in front of the PTO that allegedly described the various systems that were in the prior art such as automatic pit tracking systems or slot monitoring systems.

### 1. The '647 Patent

On May 24, 1996, Plaintiffs filed the application for the first of the National Player Recognition patents, the '647 patent. Ex. 2 to the Decl. Of Christopher J. Gaspar ("Gaspar Ex")(HARS 4603–62). Mr. John Boushy was the sole inventor, and he submitted a declaration with the PTO stating that he recognized his duty to disclose prior art information. Gaspar Exs. 1–6 (HARS 4665–66).·

The '647 patent describes several examples of methods and systems for tracking customer activity across affiliated casino properties. Stasio Ex. 1 at 1:6–10, 2:6–9. These implementations use local computers at each of the affiliated properties to collect data relating to customer activity, including information about bets placed by customers at slot machines and/or table games, as well as information about non-

gaming activity. Plaintiffs' Opposition at 7. The local computers are arranged in a local area network ("LAN") which connects the various casino properties.

The '647 patent describes three specific implementations for integration of the customer-tracking programs of the affiliated casino properties. First, Fig. 2B includes a local area network connecting a casino management system ("CMS") at a local property with devices distributed throughout the casino property. Stasio Ex. 1. The local CMS communicates with the devices to monitor customer activity. It also communicates with a central computer network that supports a central patron database to provide information for updating customer accounts in the central patron database, and to receive information from the central patron database.

In a second alternative configuration, listed in Fig. 2C, a central computer network supports a central casino managements system in addition to supporting a central patron database. This system also supports the local CMS functions. Gaspar Ex.2 at 7:49–54. Finally, in the third configuration, illustrated in Fig. 5, both the management system functions and the patron database operations are distributed amongst the local area networks at the affiliated casino properties. Id. at 3:45–47, 4:11–15, 8:1–5, 13:41–14:50.

### 2. The '362 Patent

On June 1, 1998, the day before the '647 patent was issued, Mr. Boushy filed the application for the '362 patent. Mr. Boushy was the sole inventor of the '362 patent. The '362 patent again uses the theoretical win profile generated using a customer's betting activities across affiliated casino properties to establish whether a particular customer qualifies for comps. Plaintiffs' Opposition at 12. During the prosecution of the '362 patent, the PTO

examiner rejected the claims under the application "under the judicially created doctrine of double patenting over claims 1–28 of [the '647 patent] since the claims, if allowed, would improperly extend the 'right to exclude' already granted in the ['647] Boushy Patent." Gaspar Ex. 4 (HARS 2382). Mr. Boushy overcame the PTO's rejection of the claims by filing a "terminal disclaimer" which effectively limits the terms of the '362 patent to the term of the '647 patent. *Id.* (HARS 2392).

### 3. *The '013 Patent*

Mr. Boushy, Mr. Bruce Rowe ("Mr. Rowe"), and Mr. Jayme Sevigny ("Mr. Sevigny"), were co-inventors of the '013 patent. The '013 patent expands on the '647 and '362 patents by including methods and systems for activating physical instrumentalities for the benefit or use of a customer recognized to have a special status. Stasio Ex. 3 at Abstract, 23–27. Defendants point out that PTO examiner rejected certain claims of the '013 patent application as being unpatentable in light of the '647 patent. Defendants' Motion at 12. The applicants again disclaimed the term of the '013 patent beyond the expiration of the '647 patent.

Defendants argue that because both the '013 patent and the '362 patent rely on the alleged patentability of the '647 patent, if Plaintiffs are found to have engaged in inequitable conduct with respect to the '647 patent, all three patents should be invalidated on the grounds of inequitable conduct.

## STANDARD OF REVIEW

### I. *Summary Judgment*

Summary judgment in a patent case, as in all other cases, is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Carnegie Mellon University v. Hoffmann–LaRoche,* *Inc.,* 148 F.Supp.2d 1004, 1009 (N.D.Cal. 2001). The moving party has the initial burden of "identifying for the court those portions of the materials on file in the case that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party can neither stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv.,* 809 F.2d at 630; Fed.R.Civ.P. 56(e). In a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. *State Farm Fire & Casualty Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989).

### II. *Inequitable Conduct*

Patent applicants have a duty to prosecute patent applications in the Patent and Trademarks Office ("PTO") with candor, good faith, and honesty. *Duro–Last, Inc., v. Custom Seal, Inc.,* 321 F.3d 1098, 1109 (Fed.Cir.2003) (further citations omitted). Inequitable conduct "requires proof that a patent applicant did not disclose material information to the PTO with intent to deceive." *CFMT, Inc. v. Yieldup Intern. Corp.,* 349 F.3d 1333, 1340 (Fed. Cir.2003). More specifically, inequitable conduct includes affirmative misrepresentations of a material fact, failure to disclose a material fact, failure to disclose material information, and an intent to deceive. *The Board of Education (for and on behalf of*

*the Board of Trustees of Florida University), et al., v. American Bioscience, Inc.,* 333 F.3d 1330, 1343 (Fed.Cir.2003)(further citations omitted). The elements of materiality and intent must be shown by clear and convincing evidence. *CFMT, Inc.,* 349 F.3d. at 1340.

■ In its determination of inequitable conduct, courts apply a two-step analysis. *PerSeptive Biosystems v. Pharmacia Biotech,* 225 F.3d 1315, 1318 (Fed.Cir.2000). The trial court first must determine whether the conduct meets a threshold level of materiality and intent to mislead the PTO. *Board of Education,* 333 F.3d at 1343. If both materiality and intent are established clearly and convincingly, the court then must weigh the two elements, and in light of all the circumstances, "the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Id.*

Whether or not information is material is set forth in PTO Rule 56, which reads in pertinent part:

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1)[i]t establishes, by itself, or in combination with other information, a prima facie case of unpatentability of a claim; or (2)[i]t refutes, or is inconsistent with a position the applicant takes in: (i)[o]pposing an argument of unpatentability relied on by the Office, or (ii)[a]sserting an argument of patentability.

37 C.F.R. § 1.56 (2002).

The court notes that in 1992, the PTO amended Rule 56 to provide a different standard for materiality. *Dayco Products, Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1363 (Fed.Cir.2003). The former rule stated that "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56(a)(1991). Given that the patents-in-suit were prosecuted after 1992, the court finds that the later standard of materiality should apply, which includes a more narrowly defined materiality such that Defendants must establish that the information allegedly withheld establishes either "a prima facie case of unpatentability"[1] or "refutes, or is inconsistent with a position the applicant takes." *Dayco Products Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1363–64 (quoting 37 C.F.R. § 1.56(b)(2003)).

Defendants must also establish by clear and convincing evidence that Plaintiffs acted with intent to mislead or deceive the PTO. More specifically, the "conduct must be sufficient to require a finding of deceitful intent in light of all the circumstances." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 873 (Fed.Cir. 1988). The court notes that "materiality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1567 (Fed.Cir. 1988).

■ Intent is typically inferred where the withheld information or misrepresentation is material and the patentee know or should have known of that materiality. *GFI Inc. v. Franklin Corp.,* 265 F.3d 1268,

---

1. Rule 56(b) defines a prima facie case as "established when the information compels a conclusion that a claim is unpatentable under the preponderance of the evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consis-

tent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability." 37 C.F.R § 1.56(b)(2003).

1274 (Fed.Cir.2001). However, "intent to deceive cannot be inferred solely from the fact that the information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Upjohn Co. v. Mova Pharm. Co.*, 225 F.3d 1306, 1312 (Fed.Cir. 2000). Courts will look to a "totality of the circumstances including the nature and level of the culpability of the conduct and the absence or presence of affirmative evidence of good faith." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 882 F.2d 1556, 1562 (Fed.Cir.1989). Finally, "grossly negligent conduct may or may not compel an inference of an intent to mislead." *Id.*

## DISCUSSION

Defendants argue that all three of the patents-in-suit should be invalidated on the grounds of inequitable conduct. Defendants contend that patents-in-suit are all predicated on the use of the theoretical win profile in a computerized casino player tracking system. Defendants state that Plaintiffs misrepresented the state of the prior art to the PTO by not disclosing that Plaintiffs had been using theoretical win profile in their commercial casino player reward systems more than one year prior to the May 24, 1996 filing dates of the first patent application.

Defendants contend that Plaintiffs' alleged commercial prior use is evidenced by various systems implemented by Plaintiffs' casino in the years prior to the filing of the '647 patent. First, Defendants contend that the Northern Nevada Marketing System ("NNMS") used at Plaintiffs' Northern Nevada properties, Reno and Lake Tahoe, constituted material prior art. Defendants maintain that the system tracked a player's theoretical win information from multiple casino properties over a period of time, to enable casino personnel to provide customers with rewards. Defendants argue that Plaintiffs' use of the NNMS system is directly contrary to the inventor John Boushy's statement in front

of the PTO that he was the first person to invent the claimed subject matter and that the claimed subject matter was not in commercial use prior to the filing of the '647 patent application. Defendants state that Plaintiffs had a duty to disclose their use of the theoretical win profile but instead concealed it from the PTO examiner.

Defendants also contend that Plaintiffs' Interim Patron Database ("IPDB") constituted relevant prior art that Plaintiffs failed to reveal to the PTO. Defendants state that the IPDB contained theoretical win profile information from at least four of Plaintiffs' properties nationwide. Defendants also point to Tim Slater's Automatic Player Tracking System ("APPTS") and International Game Techonology's ("IGT") commercial Standard System 1.6, both of which were used at Plaintiffs' properties more than one year prior to Plaintiffs' filing for the first patent suit.

Finally, Defendants state that Plaintiffs' deception in front of the PTO became more acute when it intentionally concealed the true facts relating to Plaintiffs' Gold Card system when the PTO examiner questioned it about a Summer of 1993 press release discussing Plaintiffs' Gold Card system. Instead of accurately discussing the program, Plaintiffs allegedly informed the PTO officer that the press release did not mention or enable theoretical win profile, and that the Gold Card system did not have the ability to monitor customer betting activity at a plurality of casino properties or to determine theoretical win profile. Defendants state that these statements were misleading and patently false.

## I. *Materiality*

■ Defendants have failed to establish that there are no genuine issues of material facts as to whether any of the systems allegedly withheld from the PTO were ma-

terial to the prosecution of the '647 patent. Instead, Defendants, without demonstrating a precise knowledge of how Plaintiffs' systems operated, repeatedly state throughout its motion that the various systems used theoretical win profile and therefore Plaintiffs' failure to disclose them was material. The court notes that while Plaintiffs did not disclose to the PTO examiner the names and specific details of the various systems in use, it did describe the general types of systems in its specification. Further, the court finds that Plaintiffs' descriptions of its systems in use prior to the filing of the '647 patent application at minimum establish that there are genuine issues of material fact as to whether they employed the use of a theoretical win profile. Finally, the types of systems used by Plaintiffs appear to have been known to the PTO examiner and were in part the basis by which he originally denied Mr. Boushy's '647 claims. Defendants have not provided the court with any evidence that Plaintiffs' description of its systems is false. Accordingly, Defendants have failed to provide the court with clear and convincing evidence of materiality.

### A. *Plaintiffs' Disclosure*

While it is undisputed that Plaintiffs did not specifically disclose by name the various programs cited by Defendants, they did refer to the types of systems in their specification. As Plaintiffs point out, the specification distinguishes the central patron database described in the patent database, from marketing systems such as the NNMS and IPDB marketing systems. Plaintiffs point to the following parts of the specification:

In the disclosed embodiment, a central database LAN 110 comprises an ethernet 106 to which a central database server and a marketing support server are connected ... For th[is] embodiment..., central database server 112 is the only essential node on LAN 110. However, it is likely that in most implementations, other nodes such as workstations 118 and marketing support server 114 will be available for marketing analysis using data derived from CPDB 220.

Stasio Ex. 1 at Figs. 1, 2B, 3, and 4:37–39, 50–55.

In the preferred embodiment of the invention, marketing support server 114 includes customer data from CPDB 220 stored in a manner that facilitates its use for marketing purposes. For example, customer data may be sorted and stored in server 114 according to customer groups segmented by profitability, principal gaming location (property), or other marketing criteria. On the other hand, customer data in server 112 is stored in a manner that facilitates rapid access by customer ID or name.

*Id.* at Figs. 1, 2B, 3, and 4:57–65.

The '647 patent specification also discloses a pit player tracking system, such as Plaintiffs' APPTS, and a slot monitoring system such as IGT's SMART system, as systems coupled to the local casino management system. Plaintiffs point to the following section of the specification:

Automatic bet tracking at slot machines 130 is monitored by a slot monitoring system (SMS) 262 on computer 154, which couples accumulated bet tracking data to CMS 234 through token ring 122. In the preferred embodiment, bet tracking is accomplished through a card reader (not shown) associated with slot machine 130. A customer inserts his or her identity card in the card reader to initiate bet tracking and removes it to terminate bet tracking. A customer's betting activity at slot machine 130 is accumulated to SMS 262 until the session is terminated or an account status is requested by CMS 234, at which time

the data is transferred to CMS 234 via LAN 120.

*Id.* at Figs. 1, 2B, 3 and 5:52–64.

LAN 120 may optionally include a pit tracking system (PTS) 258 to automatically track customer activity at gaming tables 134. PTS 258 is shown supported on a computer 174, which couples customer activity data to CMS 234 through LAN 120. PTS 258 uses card readers associated with player positions at gaming tables to track customers' betting activity. Estimates of betting activity are based on a player's time at a gaming table and the minimum bet at the table. Systems for automatically tracking betting activity at slot machines and gaming tables are well known in the art and are not described in greater detail here.

*Id.* at 5:65–6:8.

B. *Plaintiffs' Systems Did Not Employ Theoretical Win Profile*

Even if these disclosures, however, were insufficient, the programs listed by Defendants may not be material because Plaintiffs have shown that there is at least a material issue of fact as to whether or not they employed the use of a theoretical win profile prior to the filing of the patents-in-suit. Plaintiffs' patent counsel told the PTO examiner that the Gold Card Program "did not have the ability to monitor customer betting activity at a plurality of casino properties, and thus did not have the ability to determine a theoretical win profile based on such activity. Further, the disclosed system did not have the ability to accumulate points in a single account of a customer based on betting activity at a plurality of casino properties." Stasio Ex. 10 (HARS 4727); Boushy Decl. at ¶¶ 19, 22. Defendants contend that this statement was patently false and misleading because the Gold Card system, when used in conjunction with the above described systems, could track multi-property customer play at a plurality of properties and

determine theoretical win profile. Defendants' Motion at 5.

Plaintiffs have provided the court with a detailed explanation of the way in which the Gold Card system worked, as well as how it related to the other programs listed by Defendants. As a preliminary note, Plaintiffs state that the Gold Card system was not used in connection with either Plaintiffs' NNMS or the IPDB. Both systems were marketing systems used to determine a customer's eligibility for offers and promotions (mailers) and for invitations to special events or parties. Stasio Ex. 14 at 68:8–18; Ex. 29 at 38:24–39:10. Both NNMS and IPDB could extract customer information from the casino management systems at the Reno, Tahoe, Las Vegas, Joliet, and Atlantic properties such as the name and address, demographic information and player tracking and comping information, including theoretical win information. Stasio Ex. 43 at HARS 58649–50. Further, all property specific information was stored and displayed separately by property.

Defendants insist that the PTO examiner "relied exclusively on the alleged novelty of 'theoretical win profile' to allow Harrah's' patents to issue over the prior art." Defendants' Motion at 2. While the PTO examiner ultimately granted the '647 patent after receiving a more complete explanation of the term theoretical win profile, the system ultimately approved was in fact more than simply a system with the ability to compute a theoretical win profile. Instead, the invention involved "computer-implemented methods and systems for rewarding patronage, and for tracking customer activity across a plurality of properties, and for sharing customer data among such properties, that possessed the features of the claims, including theoretical win profile." Plaintiffs' Opposition at 13. While the NNMS and IPDB systems

"could extract and make use of the information provided by the patented inventions," Plaintiffs states that the systems were ultimately used for marketing purposes and not for comping and tracking through the use of a theoretical win profile. *Id.* at 3.

Plaintiffs have established that there remains at issue various facts with respect to how its programs were operated prior to the filing of the patents in suit. The court thereby finds that, with respect to the NNMS and IPDB systems, Defendants have failed to provide the court with sufficient information regarding Plaintiffs' systems such that the court might find that these marketing programs constituted material prior art. Without clear and convincing evidence that these programs were material, it is unclear to the court whether it was necessary for Mr. Boushy to disclose them to the PTO.

The court will next address Defendants' contention that the Gold Card system had the ability to track multi-property customer play and compute theoretical win profile information. Plaintiffs have explained precisely how the Gold Card System was used. Defendants have failed to refute Plaintiffs' account of the operation of the system. Under the Gold Card system, when a customer signed up for a Gold Card at a particular property, that property established an account for that customer, and gave the customer a Gold Card containing an identification number. Boushy· at ¶ 20. Through the use of the Gold Card at a given property, the customer's gaming activity was monitored and stored at the local computer system. *Id.* The Gold Card could be recognized at any Harrah's casino property, however the information was stored separately in the local computer system at each property. *Id.*

The way in which the Gold Card was recognized at various casino properties changed over the years. Initially, if a Harrah's customer used a Gold Card at a new casino, the casino employee would have to call the other Harrah's property in order to verify the customer's identity. Stasio Ex. 12 at 34:13–35:12. Eventually, Plaintiffs used a function called "auto-activation" which was implemented via a section of code called the "cross reference monitor." Stasio Ex. 15 at 125:14–128:3; Stasio Ex. 16. The auto-activation function allowed a Harrah's property, when its card reader detected a Gold Card issued at a another casino, to automatically access and copy, via a casino management system, the name and address information from that customer's master file in the system at the issuing property. Stasio Ex. 16; Stasio Ex. 15 at 125:14–128:3. Plaintiffs state, however, that the cross-reference monitor only copied basic customer information and did not copy any information about the customer's gaming activities. *Id.*

In the Background of the Invention section of the '647 patent, Mr. Boushy described how systems similar to the Gold Card system were popular within the gaming industry. These tracking programs typically allowed customers to "insert their cards in slot machines or card readers associated with gaming tables or give their cards to a casino employee" such that they could then "have their betting activity monitored and reflected in their accounts." Stasio Ex.1. Mr. Boushy stated that the problem with these systems was that with the growth of the gaming industry, casinos had "no ready means for consolidating" its data on particular customers "or making it available conveniently for use at other casinos." *Id.* The information was often accumulated in "different computer systems within the same casino" and were often stored in "different, incompatible formats." *Id.*

Plaintiffs' Gold Card system was unable, as was apparently the problem in-

dustry-wide, to enable one integrated computer system across affiliated casino properties to store complete information about customers, including information about gaming activity. Accordingly, contrary to Defendants' assertion, Plaintiffs have provided this court with information suggesting that the Gold Card system could not compute theoretical win profile information. Moreover, the system was adequately described in the Background Information of the patents-in-suit. Accordingly, the court finds that given Plaintiffs' factual showing, the court cannot conclude at this stage in the litigation that Mr. Boushy mislead the PTO examiner when it stated that the Gold Card system did not have the ability to compute a theoretical win profile or compile gaming information for multi-property play.

Defendants cite several other systems as material prior art, including Plaintiffs' Automatic Pit Player Tracking System ("APPTS"), the EDT/IGT's Standard and Smart Systems, and the Celebrity Circle Program. Defendants have not provided the court with clear and convincing evidence of the materiality of any of the three programs. The APPTS was used in connection with Reno and Tahoe's casino management system. Through the use of a customer's Gold Card, Plaintiffs' APPTS monitored the guests account number and gaming activity at a single property, and generated a customer rating displayed on that particular property's casino management system. Stasio Ex. 17 at HARS 47709; Boushy ¶¶ 35–36. Plaintiffs state that while the APPTS did not transfer customer gaming data across Plaintiffs' properties, like the Gold Card, a customer could use the APPTS located at another property through the auto-activation function described above. Stasio Ex. 17 at HARS 47759.

Plaintiffs contend that the EDT/IGT Standard and Smart Systems were similarly for use at a single property, however they also contained the ability for cross-property recognition through a program similar to the auto-activation function. The EDT/IGT systems were slot monitoring and tracking systems that automated player tracking of customers at casino slot machines at a single casino property. Decl. of Neil Spencer ("Spencer Decl.") at ¶ 47; Boushy at ¶¶ 38–39. EDT's Standard 1.6 version allowed for cross-property recognition of player cards such that a player could use a card issued at one property at another property without re-registering. Stasio Ex. 21 at HARS 20547–59. The information gathered at the new property would not be added to the information already gathered at the issuing property. The EDT Standard system was renamed the IGT SMART System upon the release of version 2.0.5 in 1994. *See* Stasio Ex. 23; Ex. 22 at 26:1–4. The new version was also a single property player tracking system, which utilized the same cross-property recognition program as the EDT Standard system. Plaintiffs' Opposition at 18.

The Celebrity Circle program was a slot monitoring system run on a local area network at individual casino properties. Stasio Ex. 27 at 35:6–14. The program was run in Reno and Lake Tahoe and customers accumulated points in their Celebrity Circle account based on their betting activity at slot machines at the two locations. *Id.* at 35:19–36:9; *Id.* at 35:19–36:4. If a customer earned points at Tahoe, the information was sent via modem to Reno, however, Plaintiffs have asserted that "it is not clear" that the points earned in Reno were totaled with those in Lake Tahoe.

As evidence showing that Mr. Boushy knew about the Celebrity Circle system, Defendants cite the statement of Tracey Austin, Director of IT at Reno, who stated that she had a conversation with Mr. Boushy. Stasio Decl. at Ex. 27, 43:25–

46:24. Ms. Austin, however, could not remember any of the details of that conversation other than that it involved "high level general functionality." *Id.* Plaintiffs state that Mr. Boushy was serving as Corporate Director of Delivery System Strategy and Interbrand Marketing Services at the time the Celebrity Circle System was implemented, and therefore he had no corporate oversight of the system. Plaintiffs' Opposition at 33. The court finds that Plaintiffs have established that with regards to the Celebrity Circle program, there is a genuine issue of fact as to whether Mr. Boushy had sufficient information regarding the Celebrity Circle system such that he would understand whether or not to inquire about it too see if it was material and thereby needed to be disclosed to the PTO examiner.

It is also unclear to the court whether the Celebrity Circle System was even material, regardless of Mr. Boushy's knowledge of the program. Plaintiffs have stated, and Defendants have failed to refute, that the Celebrity Circle system was nothing more than a typical frequent flier program used for awarding points based on customer purchase or spending for later redemption towards gifts, which was well-known to the patent examiner. Plaintiffs' Opposition at 33.

### C. *Information Already Known to PTO Examiner*

Finally, the PTO examiner was aware of the types of programs being operated by Plaintiffs. On February 4, 1997, the PTO

rejected all pending claims of the '647 patent application under 35 U.S.C. § 103(a) as unpatentable over Plaintiffs' Gold Card [2] in view of well known practices. Stasio Ex. 8 at HARS 4698. The examiner stated that the "awarding of points based on customer purchase or spending for later redemption toward gifts based on the points earned is *well-known* in service based arts." Stasio Ex. 8 at HARS 4699 (emphasis added). He also stated that "[h]aving customer accounts accessible from a plurality of locations is well known in service related arts. Frequent flier mileage accounts typically provide access to the card holder's account information from any airport check in counter corresponding to the airline with which the customer has an account or at ticket offices for that particular airline in any city." *Id.* at HARS 4700–4702.

In essence, the PTO examiner was not only stating that the current system appeared unpatentable over the Gold Card system, but also that the system, which awarded points based on customer activity for comps was already well-known in the prior art. The examiner's understanding of the Gold Card system, namely, that it did not employ the use of a theoretical win profile, comports with Plaintiffs description of that system, discussed above.

Throughout its motion, Defendants attempt to use generalities to support its argument that the systems in prior use employed a theoretical win profile. As stated above, the systems in use lacked a central database by which all customer

---

**2.** The PTO examiner cited an August 23, 1993 PR NEWSWIRE press release that discussed the Harrah's Gold Program as follows:

The Harrah's Gold Card, which customers can obtain free of charge at any Harrah's casino, tracks a player's slot and table play through a computerized system which links all of the properties and offers core benefits to cardholders nationwide.... Guests may also receive other valuable rewards and

benefits—such as complimentary meals and room nights—which are awarded by individual properties based on the Gold Card holder's tracked amount of play. The Harrah's Gold Card is always recognized at every Harrah's casino, and cardholders begin to receive the benefits the moment they become Harrah's Gold Card Members.

Stasio Ex. 9.

information for the affiliated properties could be compiled and stored, thereby enabling the computation of a theoretical win profile. Either the systems were used at an individual property, displayed composite information over time but still by location, or the systems were marketing systems, distinguishable from the central database described in the patents-in-suit. Accordingly, Defendants have failed to establish that the programs allegedly withheld from the PTO were material prior art.

II. *Intent*

■ Defendants have also failed to provide the court with clear and convincing evidence of intent on the part of Mr. Boushy to deceive the PTO. First, as stated above, Defendants have not established that the undisclosed information was material to the prosecution of the '647 patent. Moreover, there are several indications of affirmative good faith on behalf of Mr. Boushy. Mr. Boushy, and his co-inventors on the '013 patent, submitted declarations in which they acknowledged their duty to disclose material information. Further, Plaintiffs' counsel filed with the PTO Information Disclosure Statements, including results from an independent prior art search which allegedly disclosed all material prior art known to them. Stasio Ex. 6–7.

Defendants state that the prior art search was insufficient because it included only irrelevant information. Specifically, Defendants contend that none of the prior art disclosed contained "the use or calculation of theoretical win (let alone theoretical win *profile* ), nor did it disclose multi-property player tracking systems of any kind." Defendants' Motion at 4.

Defendants' argument, however, is unpersuasive. Theoretical win was a term well-known in the prior art and thereby it was unnecessary to include information re-

lated to theoretical win in the prior art search. With respect to the dearth of information about "multi-tracking" programs, as stated above, Plaintiffs did include some discussion of attempts to compile localized data in its Background of the Invention section of the patents-in-suit. Moreover, with respect to the systems familiar to Mr. Boushy discussed above, Defendants have failed to establish that to the extent any of these could be designated as "multi-property" tracking systems, none have been clearly established as material prior art. The court thereby finds that Defendants have failed to establish that Mr. Boushy intended to deceive the PTO by his failure to disclose several systems in use at Plaintiffs' casinos prior to the filing of the '647 patent application.

*CONCLUSION*

For the reasons stated above, the court DENIES Defendants' Motion for Summary Judgment of Patent Unenforceability Due to Inequitable Conduct.

IT IS SO ORDERED.